**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |  |
|---|---|---|
| L.C., *et al.*, | ) | |
| | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | 1:20-cv-1177 (PTG/TCB) |
| ARLINGTON COUNTY SCHOOL BOARD, | ) | Hon. Patricia Tolliver Giles |
| | ) | |
| *Defendant*. | ) | |
| | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION & ORDER

This matter comes before the Court on Plaintiffs L.C., *et al.*, ("Plaintiffs") and Defendant Arlington County School Board's ("Defendant") cross-motions for judgment on the administrative record (Dkt. 16, Dkt. 17) in an action brought under the Individuals with Disabilities Education Act ("IDEA"). 20 U.S.C. § 1400, *et seq.* Plaintiffs, a minor child, identified as L.C., and the child's parents, identified as J.C. and K.C., allege that the Arlington Public School System ("APS") failed to provide L.C. with the free appropriate public education ("FAPE") required by the IDEA, and that, as a result, they should be reimbursed for the expenses they paid for L.C. attending a private day school, Lab School of Washington ("Lab School"), for the 2018–2019 and 2019–2020 school years. Plaintiffs also argue that APS should be required to place L.C. at Lab School going forward. Defendant responds that it fully complied with the IDEA by providing appropriate individualized education programs ("IEPs") for L.C. in the least restrictive environment ("LRE"), which it determined to be Williamsburg Middle School ("Williamsburg"), L.C.'s neighborhood APS school. An administrative hearing was held on these claims, following

which the Hearing Officer ruled against Plaintiffs.

The issue before the Court is whether APS failed to provide L.C. with a FAPE, as required by the IDEA. 20 U.S.C. § 1400, *et seq.* The Court finds that APS did not fail to provide L.C. with a FAPE because the administrative record establishes that APS provided L.C. with IEPs that were reasonably calculated to enable L.C. to make progress in light of his circumstances in the least restrictive environment for the 2018–2019 and 2019–2020 school years. Upon consideration of the motions, the memoranda and exhibits in support thereof and in opposition thereto, the administrative record, and the arguments of counsel, for these reasons and those more fully stated below, the Court **GRANTS** Defendant's Motion for Judgment on the Administrative Record (Dkt. 17) and **DENIES** Plaintiffs' Motion for Judgment on the Administrative Record (Dkt. 16).

## I.   BACKGROUND

### A.   Factual Background

At the time of the administrative hearing, L.C. was a fourteen-year-old student at Lab School, a special education school for students with learning disabilities. Administrative Record ("AR") 182. L.C. began attending Lab School at the beginning of the 2017–2018 academic year when he was in the sixth grade. From kindergarten through fifth grade, L.C. attended his neighborhood APS school, Jamestown Elementary School ("Jamestown"). AR 265-8. In January 2014, when L.C. was in second grade, APS found L.C. eligible for special education and related services as a student with Specific Learning Disabilities ("SLD"). AR 12. This eligibility was based on identified weaknesses in the areas of reading, written expression, and phonological awareness. *Id.* From second through fifth grade, L.C. received special education services via a series of IEPs—all of which were agreed to by L.C.'s parents—while attending Jamestown. AR 14, 22, 31, 47.

2

In the fifth grade, L.C.'s IEP included the following: 3.5 hours per day (17.5 per week) of specialized instruction in reading, written language, mathematics, and organization in the general education environment with a general education and special education teacher, and 30 minutes of occupational therapy ("OT") per week in the special education setting. AR 47-10. During this time, L.C. earned: As in social studies; Bs in reading; Bs and Cs in writing; Cs in mathematics; and Bs, a C, and an A in science. AR 34-1. L.C. also took several standardized tests around this time. L.C. passed his Standard of Learning Assessments ("SOLs") in reading, science, and social studies, and missed passing mathematics by nine points. AR 52. On the Woodcock-Johnson IV, Test of Achievement, L.C. earned "Very Low," "Low," "Low Average," and "Average" test scores on various subtests. AR 41. L.C. received "Very Low" in Basic Writing Skills and Written Expression – Editing. *Id.* L.C. received "Average" in Reading Comprehension, Reading Fluency – Passage Comprehension, Reading Fluency – Oral Reading, Math Calculation Skills – Applied Problems, Written Expression, Written Expression – Writing Samples, and Academic Applications. *Id.* On the Phonological Awareness Literacy Screening ("PALS") assessment, L.C. earned reading scores at the third- to fourth-grade level, with his "accuracy" at the fourth-grade level and his "fluency" at the third-grade level. AR 210-58–59, AR 132. L.C.'s Developmental Reading Assessment and Teachers College Assessment showed that he progressed from a second-grade level to a fifth-grade level in reading over his last three years at Jamestown. AR 210-223, AR 132.

On June 7, 2017, APS convened an IEP meeting to discuss L.C.'s program for sixth grade, which marked a transition to middle school. AR 57, 134. This meeting was attended by: L.C.'s parents; Shannon McVey, General Education Teacher; Kenwyn Schaffner, Local Educational Agency ("LEA") Representative; Melissa Leupp, Occupational Therapist; Jill

3

Dulberg, Case Carrier; and Janae Rittenhouse, Williamsburg Head of Counseling. AR 57. The

IEP team proposed goals in decoding, written expression, reading comprehension, math

reasoning and calculation, and attention/organization. AR 57, 134. The IEP included 10.5 hours

per week of specialized instruction for reading, writing, and math in the self-contained setting,

and 7 hours per week of specialized support in co-taught science and social studies classes in the

general education setting. AR 134. The team also proposed 1 hour per month of OT services in

the self-contained setting to address L.C.'s handwriting needs. *Id.* The team also proposed

placement at Williamsburg, L.C.'s neighborhood middle school. *Id.*

For the first time, L.C.'s parents did not accept the IEP. AR 58. On August 9, 2017,

L.C.'s parents sent an email to APS explaining their rejection of the June 7, 2017 proposed IEP

and their decision to remove L.C. from APS and enroll him in Lab School. AR 138. L.C.'s

parents also attached a copy of the report prepared by Dr. Susan Gerson, who they had hired to

conduct a private neuropsychological evaluation. AR 137.

Dr. Gerson confirmed L.C.'s prior diagnosis of learning disability in reading/dyslexia and

learning disability in written language/dysgraphia. AR 137-17. Dr. Gerson also diagnosed L.C.

with Attention Deficit Hyperactivity Disorder ("ADHD") – Predominantly Inattentive

Presentation. *Id.* Dr. Gerson observed that L.C. "presents with a solid foundation of cognitive

skills, including above average verbal reasoning and general knowledge, average vocabulary,

age-appropriate fluid reasoning, and some solid spatial analysis skill" and that "his performance

clearly reflected a wide array of solid skills in important areas that are typically associated with

learning and academic success." AR 137-16. Dr. Gerson also observed demonstrated

difficulties, including "substantial difficulty developing his reading decoding, sight word

reading, and reading fluency skills." AR 137-16–17. Dr. Gerson stated that L.C. "requires

4

reading support" and that "a [reading] program such as the Wilson Reading System [based on phonological-coding research and Orton-Gillingham principles] could be used to build [L.C.'s reading skills." AR 137-17–18.

In response to the email from L.C.'s parents, APS convened another IEP meeting on August 28, 2017 to review Dr. Gerson's report and explore placement options. AR 60, 140. The IEP team proposed goals in motor functioning, reading decoding and comprehension, written expression, math reasoning and calculation, and attention/organization. AR 140. The team also incorporated accommodations, which were consistent with Dr. Gerson's recommendations, including a small student-to-teacher ratio, read-aloud accommodations, check-ins for understanding, teacher-provided notes and study guides, and breaking assignments into sections or chunks. *Id.* For services, the team proposed an increase in specially designed instruction from 17.5 to 21 hours per week, to include explicit instruction in organization and executive functioning in the self-contained instructional studies course. *Id.* The team also proposed an increase in OT services from 1 hour per month to 1 hour per week. *Id.* The team again proposed placement at Williamsburg. *Id.*

After the IEP meeting, later that same day, L.C.'s parents withdrew L.C. from APS to attend sixth grade at Lab School. AR 139, 142. By letter dated September 11, 2017, L.C.'s parents rejected the proposed August 2017 IEP. AR 142.

After L.C. enrolled in Lab School, APS conducted several observations of him there, the first of which occurred on October 19, 2017. AR 64. The IEP team met on November 8, 2017 to review those observations and obtain a release to consult with Dr. Gerson. AR 65, 66.

On December 21, 2017, APS conducted another IEP meeting to review and revise the IEP. AR 67, 149. L.C.'s parents and Dr. Gerson attended the meeting. AR 67, 149. The IEP

team discussed the class observation of L.C. as well as Dr. Gerson's report and recommendations. AR 67, 149. Consistent with Dr. Gerson's recommendation, the IEP team proposed that all of L.C.'s 21 hours of specially designed instruction be provided in the special education setting, including science and social studies. AR 149, 137. The IEP team continued to propose, consistent with Dr. Gerson's recommendations, instruction in a classroom with a small student-to-teacher ratio, read-aloud accommodations, check-ins for understanding, teacher-provided notes and study guides, and breaking assignments into sections or chunks. AR 149. The team also continued to propose that L.C. receive 1 hour of OT each week. AR 149. Under this proposal, L.C. would have continued to interact with his general education peers during lunch, physical education, art, music, and recess. *Id.* The team again proposed placement at Williamsburg. *Id.* By letter dated January 25, 2018, L.C.'s parents rejected the proposed December 2017 IEP. AR 151.

On February 1, 2018, APS conducted a second classroom observation of L.C. during a writing lesson at Lab School. AR 69. On July 12, 2018, APS conducted a speech and language ("S&L") evaluation of L.C., which reported his receptive and expressive language skills in the average range. AR 163. However, APS determined that L.C. "may benefit from extended time to formulate responses." AR 163.

On August 6, 2018, L.C.'s parents informed APS by letter that they were continuing his unilateral placement at Lab School for the 2018–19 school year. AR 164.

On September 11, 2018, APS held an IEP meeting that included L.C.'s parents, their attorney, and APS's speech pathologist. AR 75. The team proposed updated goals in all of L.C.'s areas of need, including decoding, written expression, reading comprehension, math reasoning and calculation, attention/organizing, and motor functioning. AR 75, 165. The team

6

also continued to propose 21 hours of specially designed instruction in the self-contained setting for English, math, science, social studies, reading, and instructional studies.  AR 75, 165. Consistent with Dr. Gerson's recommendations, the IEP team continued to propose instruction in a classroom with a small student-to-teacher ratio, read-aloud accommodations, check-ins for understanding, teacher-provided notes and study guides, and breaking assignments into sections or chunks.  AR 75, 137.  The team added an accommodation for extra time for oral responses based on the results of APS's recent S&L evaluation.  AR 75, 165.  The team also proposed 1.5 hours per week of OT services in the special education setting, 30 minutes of OT consultation per month, and 1 hour per week of S&L services in the special education setting.  AR 75, 165. The IEP team again proposed placement at Williamsburg.  AR 75, 165.  L.C.'s parents rejected this IEP at the meeting.  AR 75, 165.

On September 24, 2018, Richard Weinfeld, a private educational consultant hired by L.C.'s parents, observed the proposed programs for L.C. at Williamsburg.  AR 166.  On November 30, 2018, Mr. Weinfeld prepared an Educational Consultant Report for L.C. that discussed his observations and recommendations.  *Id.*  In his report, Mr. Weinfeld stated that the program that he observed at Williamsburg did not fully implement L.C.'s proposed IEP and that the reading class that he observed did not offer an evidence-based intervention.  *Id.*  Mr. Weinfeld explained that Williamsburg's reading teacher stated that he does not use any specific reading intervention, while the assistant principal said that "some teachers here trained in Orton Gillingham and they use different interventions on different days."  *Id.*

APS conducted a third and fourth classroom observation of L.C. at Lab School on March 12, 2019 and May 30, 2019, respectively.  AR 77, 99.  In her observation on March 12, Jennifer Doll, the Special Education Department Chair at Williamsburg, observed L.C. reading aloud

from a novel, offering responses to explicit and/or implicit questions about the text, and

following along while others were reading from the text. AR 77, 211-45. In her testimony, Ms.

Doll stated that she did not observe L.C. receiving any services that were not available to him at

APS. AR 211-9. In her observation on May 30, Shannon Cohn, L.C.'s fifth-grade general

education teacher, observed L.C. demonstrating appropriate behaviors, completing individual

assignments, working independently and silently as instructed, and participating appropriately in

classroom discussions. AR 99, 212-158.

On August 9, 2019, L.C.'s parents sent a letter to APS stating that they would be

continuing L.C.'s unilateral placement at Lab School for the 2019–2020 school year. AR 173.

On October 8, 2019, the IEP team convened a meeting that included: L.C.'s parents; their

attorney; Mr. Weinfeld; Jessica Lux, Head of Middle School at Lab School; and APS staff. AR

85. The team proposed, and L.C.'s parents agreed to, updated evaluations for L.C.'s triennial

reevaluation. AR 85, 210-188. APS's S&L evaluation indicated average expressive and

receptive skills, but "disjointed" narrative language skills. AR 86. Consistent with previous

evaluations, psychological testing indicated that L.C. had average cognitive skills, with strengths

in crystallized intelligence and fluid reasoning, and weaknesses in long-term storage and

retrieval. AR 88; AR 213-73. L.C. also continued to demonstrate ADHD-related behaviors in

some settings, but such behaviors were not "evident across settings." AR 88; AR 213-78–79.

Educational testing on the Woodcock-Johnson IV, Test of Achievement indicated that L.C.

"should be able to access grade level content, with support, in the curriculum areas of math

reasoning and written expression" but that he exhibited continued weaknesses in broad reading,

basic reading skills, reading fluency, and broad math. AR 89. The OT evaluation indicated that

L.C. demonstrated average visual perceptual skills and visual motor integration skills, and

8

challenges with writing speed and endurance.  AR 90.

On December 4, 2019, the eligibility committee found L.C. continued to be eligible for special education and related services under the category of SLD.  AR 93.  They also found L.C. to be eligible as Other Health Impairment based on the diagnosis of ADHD.  *Id.*  L.C.'s parents agreed.  *Id.*

On January 14, 2020, the IEP team reconvened to propose an annual IEP for L.C. because of his change in eligibility.  AR 96, 100, 189.  The IEP team proposed updated goals in the areas of reading, decoding, written expression, reading comprehension, math reasoning, math calculation, attention/organization, motor functioning, expressive language, social-emotional functioning, and self-determination/advocacy.  AR 96, 189.  The team proposed multiple accommodations, including read-aloud for non-reading tests, extended time on assignments, oral responses, and movement breaks.  AR 96, 189, 100.  The team also proposed increasing special education services from 21 to 24.5 hours per week to provide additional support in elective courses.  AR 96, 189.  L.C. would continue to receive 21 hours of self-contained specialized instruction in English, reading, math, instructional studies, science, and social studies, as well as 3.5 hours of special education support in team-taught specials, and/or electives such as health. AR 96, 100, 189.  The team also continued to propose 1 hour per week of S&L services, 1.5 hours per week of OT, and 30 minutes per month of OT consultation, all within the special education setting.  AR 96, 100, 189.  In addition, the team proposed extended school year services.  AR 96, 100, 189.  The IEP team again proposed placement at Williamsburg.  AR 96, 100, 189.  By letter dated January 17, 2020, Plaintiffs' counsel communicated that L.C.'s parents rejected the proposed January 2020 IEP and maintained his enrollment at Lab School.  AR 101.

9

**B.     Procedural Background**

Plaintiffs have exhausted the IDEA's required administrative procedures by presenting

their disputes to an independent Hearing Officer.  L.C.'s parents filed a due process complaint on

October 21, 2019.  AR 265-2.  Following an eight-day administrative hearing in June 2020, an

independent Hearing Officer concluded in an August 2, 2020 decision that: (1) the two-year

statute of limitations for IDEA claims barred certain of Plaintiffs' claims, namely all those

accruing prior to October 21, 2017, including the June and August 2017 proposed IEPs and

placement at Williamsburg for the 2017–2018 school year; (2) APS provided L.C. with a FAPE

at all relevant times, including its 2017–2018, 2018–2019, and 2019–2020 proposed IEPs and

placement at Williamsburg; (3) Plaintiffs' unilateral placement of L.C. at the private Lab School

was overly restrictive and not educationally required; and (4) APS was therefore not required to

reimburse Plaintiffs for their tuition costs for Lab School.  AR 265.  The Hearing Officer

published a 49-page decision after hearing from 19 witnesses and receiving over 200 exhibits.
*Id.*

On October 7, 2020, Plaintiffs filed this Complaint appealing the Hearing Officer's

decision.  Dkt. 1.  In their appeal, Plaintiffs contend that the Hearing Officer erred in concluding

that APS provided L.C. with a FAPE, L.C.'s parents were not entitled to reimbursement for

L.C.'s tuition expenses for the 2018–2019 and 2019–2020 school years at Lab School, and that

APS is not required to place L.C. at Lab School going forward.

**II.      LEGAL STANDARD**

Generally, summary judgment is proper "if the movant shows that there is no genuine

dispute as to any material fact." Fed. R. Civ. P. 56(a).  "In the IDEA context, however, a motion

for summary judgment challenging an administrative ruling 'may more aptly be described . . . as

a motion for summary adjudication.'" *D.B. v. Bedford Cnty. Sch. Bd.*, 708 F. Supp. 2d 564, 569 (W.D. Va. 2010) (quoting *Cone v. Randolph Cnty. Sch. Bd. of Educ.*, 657 F. Supp. 2d 667, 673 (M.D.N.C. 2009)); *see also Hogan v. Fairfax Cnty. Sch. Bd.*, 645 F. Supp. 2d 554, 561 (E.D. Va. 2009) (explaining that "[a] district court reviewing a state administrative decision under the IDEA may grant summary judgment based upon the administrative record"). In an IDEA case, "the existence of a disputed issue of material fact will not defeat a motion for summary judgment." *D.B.*, 708 F. Supp. 2d at 569. The district court considers the record of the administrative hearing as well as any new evidence offered by the parties, and makes an independent decision based on its view of the preponderance of the evidence. *See* 20 U.S.C. § 1415(i)(2)(C)(iii); *Hogan*, 645 F. Supp. 2d at 561. The party challenging the decision bears the burden of establishing that the Hearing Officer's decision was erroneous. *Hogan*, 645 F. Supp. 2d at 567. Here, that burden falls upon Plaintiffs.

In reviewing cross-motions for summary judgment in an IDEA action, the "reviewing court is obliged to conduct a modified de novo review [of the decision], giving 'due weight' to the underlying administrative proceedings." *MM ex rel. DM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 530–31 (4th Cir. 2002) (citing *Board of Educ. v. Rowley*, 458 U.S. 176 (1982)). The Fourth Circuit interprets *Rowley*'s "due weight" requirement to mean that the findings of fact made in the state administrative proceedings must "be considered *prima facie* correct, akin to the traditional sense of permitting a result to be based on such fact-finding, but not requiring it." *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991). If the findings are not "regularly made," however, they are not entitled to deference. *Id.*; *see also County Sch. Bd. v. Z.P. ex rel. R.P.*, 399 F.3d 298, 305 (4th Cir. 2005) ("[F]actual findings made during the state administrative proceeding are entitled to a presumption of correctness, so long as the findings were

'regularly made.'").

### III.    **DISCUSSION**

The IDEA requires states that receive federal funds for education to provide eligible children with disabilities with a "free appropriate public education." 20 U.S.C. § 1412(a)(1)(A). A FAPE should consist of "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Board of Educ. v. Rowley,* 458 U.S. 176, 203 (1982). In *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, the Supreme Court clarified the standard in *Rowley*, holding that "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." 137 S. Ct. 988, 999 (2017); *see also M.L. ex rel. Leiman v. Smith*, 867 F.3d 487, 495–96 (4th Cir. 2017). The Court further explained that an IEP typically should be "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Endrew F.*, 137 S. Ct. at 999 (internal quotation marks omitted) (quoting *Rowley*, 458 U.S. at 203–04). The IEP must be "*reasonable*," however, it need not be "ideal." *Id.* (citing *Rowley*, 458 U.S. at 206–07).

The IDEA also requires that an educational placement be in the "[l]east restrictive environment" that is appropriate. 20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.114. The Fourth Circuit has explained that "[t]he LRE requirement reflects the IDEA's preference that '[t]o the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled.'" *AW ex rel. Wilson v. Fairfax Cnty. Sch. Bd.*, 372 F.3d 674, 681 (4th Cir. 2004); *see also Rowley*, 458 U.S. at 202.

If a public school cannot provide a FAPE in the public school system, the IDEA requires the school district to assume the cost of educating the child in a private school that meets the child's

educational and social service needs. 20 U.S.C. § 1412(a)(10)(B).  Parents may be reimbursed for

unilateral private placement when a court or hearing officer determines: (1) a school district failed

to provide a FAPE; and (2) the private placement was suitable.  *Forest Grove Sch. Dist. v. T.A.*, 557

U.S. 230, 247 (2009).  The IDEA has a two-year limitations period.  20 U.S.C. § 1415(b)(6)(B);

*see also Fairfax Cnty. Sch. Bd. v. Knight*, No. 1:05-CV-1472, 2006 WL 6209927, at *6 (E.D. Va.

Aug. 23, 2006), *aff'd*, 261 F. App'x 606 (4th Cir. 2008) (parent may recover for only that conduct

of the school district that was alleged to have occurred within two years prior to the filing date of

the due process hearing request).

It is against this background that Plaintiffs claim that APS failed to provide L.C. with a

FAPE and challenge the Hearing Officer's decision on both procedural and substantive grounds.

Specifically, Plaintiffs claim that the Hearing Officer's decision was based on an incorrect legal

standard and is not entitled to deference because it was not "regularly made."  Dkt. 16-1 at 12–14.

For the reasons set forth below, summary judgment is granted in favor of Defendant.

### A.      The Hearing Officer Applied the Correct Legal Standard

Plaintiffs argue that the Hearing Officer failed to apply the appropriate legal standard, as

articulated in *Endrew F.*, to determine whether APS has offered a FAPE.  *Endrew F.*, 137 S. Ct.

at 999.  The Court disagrees.

The Hearing Officer explicitly articulated the correct standard from the Supreme Court's

decision in *Endrew F.*, and stated that APS's proposed IEPs complied with this standard:

> *Endrew F.* … enlarged upon the 1982 *Rowley* case, holding that an appropriate
> education for a student with a disability is one that is "reasonably calculated to
> enable a child to make progress appropriate in light of the child's circumstances."
> The Court further stated that an IEP must be "reasonable" but need not be "ideal."
> There is no doubt that the APS Proposed 2017–2018, 2018–2019, and 2019–2020
> IEPs met this standard.

AR 265-41–42.  Indeed, the Hearing Officer repeatedly referenced *Endrew F.*'s distinction

13

between "reasonable" and "ideal."  AR 265-45–46 (citing *Endrew F.* and noting that the public

school system is "not required to provide the best possible education or an ideal education in order

to provide a FAPE to the Child.").  Ultimately, the Hearing Officer concluded that the relevant

IEPs "were appropriate and calculated to provide LC with FAPE pursuant to the Individuals with

Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.* ("IDEA") and in accordance with *Endrew*

*F. v. Douglas County School District*, 137 S. Ct. 988 (2017)."  AR 265-46.

Nevertheless, Plaintiffs contend that the Hearing Officer's reference to an analogy that the

IDEA requires a "serviceable Chevrolet," not a "Cadillac," indicates that the Hearing Officer

utilized an impermissible "*de minimis*" substantive standard.  Dkt. 16-1 at 13–14 (quoting *Doe v.*

*Board of Educ.*, 9 F.3d 455, 459–60 (6th Cir. 1993)).  Contrary to Plaintiffs' argument, the

Chevrolet-Cadillac analogy stands for the same proposition articulated in *Endrew F.* that an IEP

must be "*reasonable*," however it need not be "ideal."  *Endrew F.*, 137 S. Ct. at 999.  Further, even

if the Court accepted the position that the Chevrolet-Cadillac analogy is outdated, the Hearing

Officer makes clear that her decision was based on the correct standard from *Endrew F.* by

concluding that the proposed IEPs "were calculated to provide LC an educational program

reasonably calculated to enable [L.C.] to make meaningful progress appropriate in light of his

circumstances."  AR 265-46.

Accordingly, the Court concludes that the Hearing Officer articulated and applied the

correct legal standard.

**B.  The Hearing Officer's Decision Is Entitled to Deference**

Plaintiffs claim that the Hearing Officer's decision was not "regularly made," and thus, is

not entitled to deference upon review by the Court.  *Z.P.*, 399 F.3d at 305.  Plaintiffs allege two

errors in this category: (1) the Hearing Officer ignored evidence of L.C.'s failure to make

14

appropriate progress at Jamestown; and (2) the Hearing Officer ignored Plaintiffs' witnesses and evidence. Dkt. 16-1 at 14, 24.

When reviewing whether a Hearing Officer's decision was "regularly made," a court considers whether the Hearing Officer "conducted a proper hearing, allowing the parents and the School Board to present evidence and make arguments, and . . . by all indications resolved the factual questions in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating [their] responsibility to decide the case." *J.P. ex rel. Peterson v. Cnty. Sch. Bd.*, 516 F.3d 254, 259 (4th Cir. 2008). "Factual findings are not regularly made if they are reached through a process that is far from the accepted norm of a fact-finding process." *Z.P.*, 399 F.3d at 305 (internal quotation marks omitted); *see also Doyle*, 953 F.2d at 105 ("[I]n deciding what is the due weight to be given an administrative decision under *Rowley*, we think a reviewing court should examine the way in which the state administrative authorities have arrived at their administrative decision and the methods employed."). In reviewing the administrative record, courts must give due regard to the Hearing Officer's findings because they had the opportunity to hear the testimony and assess the weight and credibility of the witnesses. *See Doyle*, 953 F.2d at 104–05; *A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 327–28 (4th Cir. 2004); *Z.P.*, 399 F.3d at 306–07 ("We have held that credibility determinations implicit in a hearing officer's decision are as entitled to deference under *Doyle* as explicit findings."). Based on these considerations, the Court concludes that the Hearing Officer's decision was "regularly made."

### 1.   The Hearing Officer's Decision Adequately Treated Evidence of L.C.'s Progress at Jamestown

Plaintiffs contend that the Hearing Officer "ignore[d] the wealth of uncontested data offered by the parents that shows that L.C. failed to make appropriate progress while attending Jamestown." Dkt. 16-1 at 14.

15

First, even if the Court accepted as true Plaintiffs' position that L.C. failed to make appropriate progress at Jamestown during his elementary school years—and it does not—that is insufficient to drive the conclusion that L.C. would fail to make appropriate progress at Williamsburg for the 2018–2019 and 2019–2020 school years, where, as here, the IEPs proposed for those school years included significant and tailored increases in L.C.'s special education services compared to his 2016–2017 school year at Jamestown. In the 2016–2017 school year, L.C. received 15 hours per week of specially designed instruction in reading, math, and written language in the general education setting in co-taught classrooms and OT for 30 minutes per week in the special education setting, AR 31; meanwhile, for the 2018–2019 school year, LC would have received 21 hours per week of special education services, 1 hour per week of S&L services, 1.5 hours per week of OT, and 30 minutes of OT consultation per month, all within the special education setting, AR 75, and in the 2019–2020 school year, L.C. would have received 24.5 hours per week of special education services, 1 hour per week of S&L services, 1.5 hours per week of OT services, and 30 minutes per month of OT consult services, all within the special education setting. AR 96. The proposed IEPs for the 2018–2019 and 2019–2020 school years also included updated goals and accommodations compared to 2016–2017. AR 75, 96. For these reasons, L.C.'s alleged lack of progress at Jamestown, even if accepted by the Court, is unpersuasive to resolve the question currently at issue: whether APS's proposed IEPs for the 2018–2019 and 2019–2020 school years were "reasonably calculated" to enable L.C. "to make progress appropriate in light of [his] circumstances." *Endrew F.*, 137 S. Ct. at 999.

Second, the administrative record shows that L.C. *did* achieve progress while at Jamestown. Plaintiffs allege that L.C. was "functionally illiterate" at the end of fifth grade, referring to L.C.'s low scores on certain standardized tests, including the Word Identification and

Spelling Test, Wilson Assessment of Decoding and Encoding, and Test of Word Reading Efficiency, to support their conclusion. Dkt. 16-1 at 14–15, 17. However, L.C.'s APS teachers and evaluators explicitly disagreed with this assessment. APS teachers explained that standard educational measures, while important, are just one data point of "multiple sources" that teachers look to in order to understand the whole picture. AR 209-160. Ms. Doll, who evaluated L.C. and participated in his IEP meetings, testified that L.C. had the "literacy skills that he needed for effective functioning in his group and community." AR 211-105–06. Jill Dulberg, L.C.'s fifth-grade special education teacher, testified that, according to L.C.'s performance on standardized tests and in class, L.C. was "able to access the [fifth-grade] curriculum and make some progress." AR 211-143. Other data points also indicated that L.C. was making progress in elementary school. For example, in fifth grade, L.C.: passed the SOL in every subject but math,[1] AR 52; showed progress on his reading SOL compared to the previous year, AR 3-1; and obtained passing grades on his report card, AR 34. Plaintiffs also allege that L.C.'s failure to master his IEP goals serves as compelling evidence that L.C. failed to make progress while at Jamestown. Dkt. 16-1 at 19. However, during fifth grade, L.C.'s IEP progress report indicated that L.C. received a mastery level of "sufficient progress" toward nearly all of his IEP goals. AR 51; AR 211-111. For example, in February 2017, L.C.'s progress report noted that he answered 65% of his reading comprehension questions accurately, while his annual goal was to answer reading comprehension questions with 75% accuracy. AR 51-3–4. In April 2017, L.C.'s progress report indicated that he

---

[1] Plaintiffs allege that the results of L.C.'s reading SOL are not reliable evidence of his progress because L.C. was improperly given a read-aloud accommodation on that portion of the assessment. Dkt. 16-1 at 17–18. However, Ms. Dulberg, who proctored the assessment, testified that L.C. did not receive the read-aloud accommodation for the reading SOL. AR 211 at 1032–33. Accordingly, the Court finds that the Hearing Officer did not err in crediting the testimony of Ms. Dulberg over assertions first raised by L.C. and his parents years later. AR 265-11–12.

was now reading at an early fifth-grade level.  AR 51-1; AR 211-170–171.

While it is true, as Plaintiffs contend, that the Hearing Officer's decision does not make reference to certain pieces of evidence or testimony that Plaintiffs' arguments rely on, based on the record, the Court cannot conclude that L.C. did not make progress at Jamestown.  Accordingly, the Court concludes that the Hearing Officer's decision in this respect was supported by the record, and rejects Plaintiffs' argument that the Hearing Officer's treatment of evidence of L.C.'s progress at Jamestown was improper.

### 2.    The Hearing Officer's Decision Adequately Discussed Plaintiffs' Experts and Evidence

At the administrative hearing, the Hearing Officer heard conflicting opinions from Plaintiffs' witnesses and APS's witnesses.  Plaintiffs contend that the Hearing Officer's written decision was "not regularly made" because the Hearing Officer "consistently ignored conflicting evidence when making her factual findings" and "disregarded *without explanation*, much of the evidence presented by the parents and their experts, as well as many of the parents' arguments." Dkt. 19 at 4.

First, the Hearing Officer was not required to provide a full explanation of each credibility determination.  *J.P.*, 516 F.3d at 262 ("If anything, our case law suggests that the level of detail required of a hearing officer is relatively low."); *Z.P.*, 399 F.3d at 306 (explaining that *Doyle* "does not require the *hearing officer* to explain in detail its reasons for accepting the testimony of one witness over that of another").  Under the Fourth Circuit's applicable standards for a decision, the level of detail provided by the Hearing Officer in her decision is clearly adequate.  *Z.P.*, 399 F.3d at 306; *J.P.*, 516 F.3d at 261–62 (explaining that "case law does not require an IDEA hearing officer to offer a detailed explanation of his credibility assessments," and that a hearing officer's findings are entitled to deference even if that opinion contained only short "summaries" of

testimony and "no explanation of which evidence the hearing officer found to be most important or why the hearing officer was persuaded by the [school district's] evidence"); *A.B.*, 354 F.3d at 327–28 (reversing the district court's opinion rejecting the hearing officer's decision and noting that "the district court disregarded the ALJ's resolution of conflicting expert testimony. The ALJ carefully considered the views of [the student's] experts . . . implicitly finding them unconvincing while crediting the contrary views of [the school district's] experts").

Plaintiffs contend that the Hearing Officer failed to explain how she gave Dr. Gerson's testimony "considerable weight" but did not accept each of her conclusions and recommendations. Dkt. 16-1 at 20 (citing AR 265-38).  While the Hearing Officer did not accept all aspects of Dr. Gerson's testimony, including her evaluation that L.C. was "functionally illiterate"—instead crediting the testimony of APS teachers and evidence that demonstrated he was not—the Hearing Officer did accept certain aspects of Dr. Gerson's testimony, including her diagnoses of dyslexia, dysgraphia, and ADHD.  AR 208-212–213; AR 211-105–06, AR 211-143, AR 52, AR 3-1, AR 34; AR 265-38–39. Consistent with the Fourth Circuit's standard, the Hearing Officer reached her decision through reviewing evidence and witnesses' testimony from both sides in a regular fact-finding process and she was not required to provide detailed explanations of why she did not accept each of Dr. Gerson's conclusions. *J.P.*, 516 F.3d at 262; *Z.P.*, 399 F.3d at 306.

Second, as Defendant observes, the Hearing Officer *did* make "numerous, express assessments of the relative weight and credibility of the witnesses." Dkt. 18 at 24. For example, the Hearing Officer explained that she "gave less weight" to the testimony of Mr. Weinfeld because, in part:

> Mr. Weinfeld went to the APS Williamsburg Middle School in the fall of 2018; more than a year after LC had left to go to the Lab School. His stated purpose was to evaluate the IEPs proposed for LC's at Williamsburg Middle School by observing other special education students in several classes, such as a reading, social science and math class. The

> effectiveness and relevance of this exercise is questionable, in that the students observed all had different IEPs from that proposed by APS for LC. Additionally, Mr. Weinfeld did not ask to speak to the Williamsburg Reading specialist, Ms. Han, nor did he ask to speak with LC's 5th grade Jamestown Elementary School teachers such as Ms. Dulberg, his 5th grade special education reading teacher. The only actual contact Mr. Weinfeld had with LC were two observations at the Lab School. He never evaluated LC or spoke with him. I did not find his expert opinion that the Lab School was the best placement for LC to be entitled to much weight. In part, because I do not believe that his opinion was fully informed as it demonstrated a lack of knowledge of the programs offered in the APS IEPs and available at Williamsburg Middle School.

AR 265-35–36 (internal citations omitted). The Hearing Officer also explained that she did not

give significant weight to the testimony of Melissa Wood or Jessica Lux, both educators at Lab

School, because neither had direct experience with L.C. as a student. AR 265-39.

Plaintiffs also argue that the Hearing Officer "gave blind deference to the APS witnesses."

Dkt. 16-1 at 22. However, consistent with her treatment of Plaintiffs' witnesses, the Hearing

Officer explained her assessments of the relative weight and credibility of APS's witnesses. The

Hearing Officer explained that "more weight was given to Ms. Dulberg['s] and Ms. Cohn's

testimony than that of Mr. Weinfeld" because Ms. Dulberg "was able to observe LC and testify

knowledg[e]ably about [L.C.'s] progress in reading. [Ms. Dulberg] also participated in his IEP

meetings where she contributed essential information and guidance based on her in-depth

knowledge of LC and his educational needs" and Ms. Cohn "also personally observed [L.C.] at

Lab School in 2019." AR 265-34–35. Moreover, the record supports the Hearing Officer's

determination that APS witnesses had more familiarity with L.C., and thus, were in a better

position to assess whether Williamsburg could meet L.C.'s needs. Ms. Dulberg and Ms. Cohn co-

taught L.C. in his fifth-grade class, and each worked with L.C. for approximately 5 hours per day

of that school year. AR 211-130–31, 211-133, 212-127. Ms. Dulberg worked with L.C. on

reading, writing, math, science, and social studies, including specialized instruction in reading,

writing, and organization. AR 211-133, 141. Ms. Cohn worked with L.C. on all subjects except

for math, including small group instruction.  AR 212-127.  Both Ms. Dulberg and Ms. Cohn testified that L.C. made academic progress in fifth grade.  AR 211-143, 212-143.

The substance of the Hearing Officer's decision does not support Plaintiffs' contention that she ignored Plaintiffs' witnesses or evidence, particularly in light of her findings that Mr. Weinfeld, Ms. Lux, and Ms. Wood did not have direct experience with L.C. as a student, while Ms. Dulberg and Ms. Cohn did.  AR 265-34–36, 265-39.  Based on the administrative record, it was appropriate for the Hearing Officer to give greater weight to APS's witnesses.  *See A.B.*, 354 F.3d at 328 ("IDEA requires great deference to the views of the school system rather than those of even the most well-meaning parent.").  For these reasons, the Court finds that decision meets the specificity standards described by the Fourth Circuit.  *Z.P.*, 399 F.3d at 306; *J.P.*, 516 F.3d at 261–62.  Accordingly, the Court rejects Plaintiffs' argument that the Hearing Officer's credibility determinations were improperly made.

### C.   The Hearing Officer Correctly Found that APS's 2018–2019 and 2019–2020 IEPs were Appropriate and in the Least Restrictive Environment

#### 1.   2018–2019 IEP

The September 11, 2018 IEP was "reasonably calculated to enable [L.C.] to make progress appropriate in light of [his] circumstances."  *Endrew F.*, 137 S. Ct. at 999.  The IEP contained multiple goals and accommodations that were the result of collaboration between L.C.'s parents and APS staff and based on review of various reports, testing, and observations.  AR 75.  Indeed, the proposed IEP included instruction in a classroom with a small student-to-teacher ratio, read-aloud accommodations, check-ins for understanding, teacher-provided notes and study guides, and breaking assignments into sections or chunks—all of which were included in Dr. Gerson's recommendations.  AR 75, 137.  The IEP team proposed updated goals in all of L.C.'s areas of need, including decoding, written expression, reading comprehension, math reasoning and

calculation, attention/organizing and motor functioning. AR 75. The team proposed 21 hours per week of specially designed instruction to support L.C.'s goals. *Id.* The team also proposed 1 hour per week of S&L services, 1.5 hours per week of OT services in a special education setting, and 30 minutes of OT consultation per month. *Id.* As discussed above, L.C. achieved progress at Jamestown, and would receive significantly more special education services under the proposed IEP. In addition, the proposed IEP contains similar services to those that L.C. received while attending Lab School, where Plaintiffs allege that L.C. has made significant educational improvements. Dkt. 16-1 at 10. Ms. Doll, who had observed L.C. at Lab School, testified that she did not see him receiving services that were unavailable to him at Williamsburg. AR 211-9.

Plaintiffs argue that the proposed IEP was not clear because APS did not include in L.C.'s IEP that APS will utilize Orton-Gillingham ("OG") instruction—an evidence-based intervention—as requested by L.C.'s parents. Dkt. 16-1 at 25–27. Further, based on Mr. Weinfeld's observations at Williamsburg, Plaintiffs claim that APS is incapable of providing L.C. with OG instruction. *Id.* at 27. In contrast, Defendant claims that, under the proposed IEP, L.C. would have been instructed at Williamsburg in a reading class that utilized OG instruction. Dkt. 20 at 24. In support of this claim, Ms. Doll testified that L.C.'s IEP calls for an "evidence-based reading intervention," such as OG instruction, but IEPs typically do not list a specific intervention methodology. AR 211-69–70. Elisha Han, Williamsburg's Reading Specialist, testified that APS is capable of providing L.C. with OG reading instruction. AR 212-33. APS staff also testified that they have worked with students with similar needs in the past. AR 212-33–34. The Court finds that APS was responsive to L.C.'s needs and his parents' request by incorporating an evidence-based reading intervention in his IEP. The Court also finds that, while the proposed IEP does not specify that APS will utilize OG instruction, Plaintiffs have not provided sufficient

evidence to indicate that an education via a different intervention method is not "reasonably calculated to enable [L.C.] to make progress appropriate in light of [his] circumstances." *Endrew F.*, 137 S. Ct. at 999. Indeed, Dr. Gerson recommended OG instruction as just one of several potential approaches in her report to L.C.'s parents. AR 137 at 17–18.

Plaintiffs also argue that the IEP could not be implemented as written, based on their receipt of mock schedules that were inconsistent with the proposed IEP. Dkt. 19 at 29, 31. However, the IEP is to be judged based upon its contents at the time it is offered, and subsequent draft schedules are not construed "as a constructive amendment of the IEP." *M.M. v. Arlington Cnty. Sch. Bd.*, Case No. 1:11-cv-6, at *6 (E.D. Va. Aug. 17, 2011) (not reported). Nevertheless, APS staff testified that APS was capable of implementing the proposed IEP. *See* AR 212-33–34.

Finally, the IEP would have been implemented at Williamsburg, L.C.'s neighborhood school, which would be the least restrictive environment for L.C. AR 265-23; 20 U.S.C. § 1412(a)(5). LRE requirements provide that, "[t]o the maximum extent appropriate, children with disabilities . . . [must be] educated with children who are nondisabled." 34 C.F.R. § 300.114(2). Moreover, a school system must ensure that the student's placement is "as close as possible to the child's home." 34 C.F.R. § 300.116(b)(3). Williamsburg is clearly the least restrictive environment, as Lab School is a private school comprised only of students with learning disabilities and located an hour away from L.C.'s home, and Williamsburg is L.C.'s neighborhood school, which includes students with learning disabilities and general education students. Accordingly, the Hearing Officer correctly found that APS's proposed IEP for the 2018–2019 school year was appropriate and would enable L.C. to receive a FAPE in the least restrictive environment.

## 2. 2019–2020 IEP

The January 14, 2020 IEP was "reasonably calculated to enable [L.C.] to make progress appropriate in light of [his] circumstances." *Endrew F.*, 137 S. Ct. at 999. The IEP contained multiple goals and accommodations that were the result of collaboration between L.C.'s parents and APS staff and based on review of various reports, testing, and observations. AR 96, 100, 189. The 2019–2020 IEP proposed the same accommodations as the 2018–2019 IEP that were also included in Dr. Gerson's recommendations. AR 96, 189. The IEP team updated the goals in the areas of reading, decoding, written expression, reading comprehension, math reasoning, math calculation, attention/organization, motor functioning, expressive language, social-emotional functioning, and self-determination/advocacy. AR 96, 189. The team proposed multiple accommodations, including but not limited to read-aloud for non-reading tests, extended time on assignments, oral responses, movement breaks, word processor use, modification of homework, chunking and scaffolding of assignments, preferential seating, graphic organizers and agenda checks. AR 96, 189. The team proposed increasing special education services to 24.5 hours per week to provide additional support in elective courses. AR 96, 189. The team also continued to propose 1 hour per week of S&L services, 1.5 hours per week of OT, and 30 minutes per month of OT consultation, all within the special education setting, and proposed extended school year services for L.C. AR 96, 189. As discussed above, L.C. achieved progress at Jamestown, and would receive significantly more special education services under the proposed IEP. Again, similar to the 2018–2019 IEP, Ms. Doll testified that she compared Lab School's IEPs with APS's January 2020 proposed IEP and determined that there were no substantive differences. AR 211-10. In addition, according to Ms. Doll, there were no goals or accommodations that L.C.'s parents asked to be included in the IEP that were not included. AR 211-9–10.

24

The IEP would have been implemented at Williamsburg, L.C.'s neighborhood school, which, as discussed above, would be the least restrictive environment for L.C. AR 96, 100, 189; 20 U.S.C. § 1412(a)(5). Accordingly, the Hearing Officer correctly found that APS's proposed IEP for the 2019–2020 school year was appropriate and would enable L.C. to receive a FAPE in the least restrictive environment.

## IV.      CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Judgment on the Administrative Record (Dkt. 17) and **DENIES** Plaintiffs' Motion for Judgment on the Administrative Record (Dkt. 16).

It is **SO ORDERED.**

June 24, 2022
Alexandria, Virginia

Patricia Tolliver Giles
United States District Judge

25